**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LABOR ONE, INC., an Illinois Corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17 C 7580 |
| ) | |
| STAFF MANAGEMENT SOLUTIONS, LLC, ) | Judge Rebecca R. Pallmeyer |
| an Illinois Limited Liability Company, ) | |
| ARAMARK SERVICES, INC., a Delaware ) | |
| Corporation, and ARAMARK FOOD AND ) | |
| SUPPORT SERVICES, INC., a Delaware ) | |
| Corporation, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

The parties to this case are both in the business of providing temporary workers to other businesses. Between July 2015 and May 2017, Plaintiff Labor One, Inc. was a subcontractor for Defendant Staff Management Solutions, Inc. Under the parties' contract, Labor One provided temporary employees to Staff Management's clients, including Defendants Aramark Services, Inc. and Aramark Food and Support Services Group, Inc. (collectively, Aramark). A billing dispute arose, however, and Staff Management terminated the contract in May 2017. This lawsuit, between two Illinois entities, followed.

In a ruling last year, this court concluded that Plaintiff Labor One's claims do not arise under federal law, and that there is no other basis for federal jurisdiction. *Labor One, Inc. v. Staff Management Solutions LLC*, No. 17 C 7580, 2018 WL 4110676 (N. D. Ill. Aug. 8, 2018). Labor One has filed an amended complaint, but the court stands by its conclusion that the parties' business dispute does not give rise to claims under federal antitrust or civil rights law. Accordingly, Defendants' motion to dismiss [62] is granted.

## BACKGROUND

Labor One's amended complaint [52] alleges the following: Staff Management is a procurement manager for temporary labor services. (Am. Compl. ¶¶ 13, 22.) It is also "in the business of providing its own temporary workers to other entities while performing centralized management services" in connection with those workers. (*Id.* ¶ 13.) At some point, Aramark "retained Staff Management as the procurement manager" for temporary employees at McCormick Place, a venue in Chicago, Illinois. (*Id.* ¶ 22.)

Labor One, too, is in the business of providing temporary workers. (*Id.* ¶ 13.) In what it calls a "Community First Program," Labor One hires temporary employees from "specifically targeted low-income neighborhoods" of Chicago "to create local jobs." (*Id.* ¶¶ 15, 20.) In July 2015, Aramark "contacted Labor One about providing temporary labor services at McCormick Place" under the Community First Program. (*Id.* ¶ 14.) At the time, Aramark "was aware that Staff Management had its own preferred vendor list for temporary workers" and that Staff Management "did not want Labor One as the provider of temporary labor services at McCormick Place." (*Id.*) Nonetheless, on July 22, 2015, Labor One and Staff Management entered into a contract under which Labor One would supply temporary employees to Aramark—via Staff Management—for work at McCormick Place. (*Id.* ¶ 22.) Because Labor One planned to provide temporary workers from its Community First Program, "most, if not all, of the temporary workers to be supplied under the" contract were African American. (*Id.* ¶ 20.) Indeed, in its original complaint, Labor One alleged that it "only hired African-American workers." (Compl. [1] ¶ 94). Perhaps in response to the court's concern about that allegation (see Memorandum Order [46] at 6-7), Labor One now alleges it "has laborers from various ethnic and racial backgrounds." (Am. Compl. [52] ¶ 21.)[1]

---

[1] The parties do not specify whether Labor One supplies temporary employees other than through the Community First Program.

Under the contract between Labor One and Staff Management, Staff Management would receive "a fee of 3% for providing centralized management services" to Aramark in connection with temporary employees that Staff Management procured for McCormick Place. (*Id.* ¶ 22.) The contract also required Staff Management to use a "Vendor Managed System (VMS) . . . for the acquisition, tracking, reporting and billing of Services for" Aramark. (*Id.* ¶ 24.) In addition, it required Labor One to "enter its billing hours for temporary labor services into the VMS system." (*Id.* ¶ 25.) Finally, it required Staff Management to pay Labor One after Aramark approved Labor One's billing entries. (*Id.* ¶ 26.) Staff Management, in turn, would "receive a commission from all invoices created by Labor One in the VMS system." (*Id.*)[2]

Between 2015 and 2017, Labor One "encountered technical issues with the VMS system . . . in entering its billing hours." (*Id.* ¶ 29.) Labor One made repeated efforts to seek assistance from Staff Management with these issues, but its efforts were "to no avail." (*Id.* ¶ 31.) On some occasions, Aramark participated in the negotiations between Staff Management and Labor One. (*See, e.g.*, *id.* ¶¶ 36-46.) Staff Management, for its part, failed to timely pay Labor One for the services it provided. (*See id.* ¶¶ 28, 34.)

After this billing dispute arose, Staff Management "began to raise concerns about the honesty and quality of Labor One's temporary workers." (*Id.* ¶ 41.) At one point, Staff Management "accused Labor One's temporary workers of 'stealing time and hours' when assigned to a job with Aramark" and stated that the workers' conduct in this regard "was the reason for the delay in payment of the invoices." (*Id.* ¶ 42.) In addition, "[a]s a result of Labor One's efforts to get paid for its services, Staff Management began to request [repeated]

---

[2] This commission appears to be the same as the three percent fee for providing centralized management services. (*See* Labor One Opp. 9 (stating that pursuant to the contract, "Labor One was to pay Staff Management 3% of its gross sales per invoice for Staff Management's role as a fee-charging procurement manager of temporary labor services at McCormick Place for Aramark").)

3

background checks and drug tests for all of its temporary laborers working at McCormick place." (*Id.* ¶ 44; *see also id.* ¶ 46 (alleging that Staff Management started requesting "full-scale drug testing . . . even though the [contract with Labor One] provided for random testing").) And in a meeting around November 2016, Staff Management asked Labor One to "stop providing 'those people'"—meaning workers from the Community First Program—to Aramark at McCormick Place. (*Id.* ¶ 45.) Staff Management tried to force Labor One to instead "hire temporary workers from Staff Management's parent company or transition [Labor One's] temporary workers to Staff Management's preferred vendor list." (*Id.* ¶ 98; *see also id.* ¶ 45.) Around the same time, "Aramark employees" disclosed to Labor One supervisors that Staff Management was withholding payment from Labor One "in an attempt to force [it] to terminate the Contract and get rid of Labor One's workers from the Community First Program." (*Id.* ¶ 46.) In a letter dated May 26, 2017, "Staff Management unilaterally terminated" the contract with Labor One and "claim[ed] that the termination was due to Labor One's failure to enter time correctly in the VMS system." (*Id.* ¶ 48.)

According to Labor One, Staff Management still owes it $48,063.75. (*Id.* ¶ 49.) Labor One asserts claims against Staff Management for breach of contract (Count I); intentional interference with prospective economic relations (Count II); negligent interference with economic relations (Count III); violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count V); violation of Illinois' unfair competition law (Count VI); commercial disparagement under Illinois common law (Count VII); and violation of the Civil Rights Act, 42 U.S.C. § 1981 (Count VIII). Labor One asserts a claim against Aramark for unjust enrichment (Count IV).

## DISCUSSION

As in Labor One's original complaint, only two of the counts in the amended complaint invoke federal law: Count V, which asserts a claim arising under the Sherman Act, 15 U.S.C. § 2, and Count VIII, which asserts a claim arising under the Civil Rights Act, 42 U.S.C. § 1981. To survive Staff Management's motion to dismiss these counts, Labor One's amended complaint must include enough factual detail to give Staff Management fair notice of the claims and the

4

grounds upon which they rest, and the allegations must amount to a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). To state a plausible claim, Labor One must allege enough factual matter, taken as true, to "raise a right to relief above the speculative level" and "nudge[] [its] claims across the line from conceivable to plausible." *Bell Atl. v. Twombly*, 550 U.S. 544, 555-57 (2007). In determining whether Labor One meets this test, the court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of Labor One. *Iqbal*, 556 U.S. at 679. The court does not, however, accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679. Formulaic recitation of the elements of a cause of action supported by conclusory statements are insufficient. *Id.* at 678; *see also Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (affirming dismissal of antitrust claims that were "pleaded in a wholly conclusory fashion" and "appear[ed] to sweep in the entire gamut of federal antitrust violations"); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) (in general, antitrust claims "will require more detail, both to give the opposing party notice of what the case is all about and to show how . . . the dots should be connected").

As the court will explain, Labor One's allegations that Staff Management violated the Sherman Act and the Civil Rights Act do not meet these pleading standards.

**A.      Sherman Act**

Labor One alleges that Staff Management violated Section 2 of the Sherman Act by attempting to monopolize the business of "suppl[ying] . . . temporary workers to Aramark at McCormick Place." (Am. Compl. ¶¶ 94-97.)[3] Under Section 2, "[e]very person who shall

---

[3]      Labor One equivocates in defining the relevant market for purposes of this claim. In some places, it defines the market as "staffing temporary labor services at McCormick Place." (Am. Compl. ¶ 96; *see also, e.g.*, *id.* ¶¶ 97-98, 101-02, 104, 106.) In other places, it defines the relevant market as "the Chicago Market for staffing services." (*Id.* ¶ 94; *see also* Labor One Opp. to Defs.' Mot. ("Labor One Opp.") [68], 4 (alleging that Staff Management excluded Labor One "from the relevant market of providing temporary labor services at McCormick Place, as well as at any location Aramark services in the Chicago market").) In still others, Labor One defines the relevant market as providing temporary labor services at McCormick Place and Navy Pier, another venue in Chicago. (*See* Labor One Opp. 6.) Because the amended complaint does not contain any factual allegations concerning the "Chicago market" or Navy Pier, the court will

5

monopolize, or attempt to monopolize" is subject to antitrust liability. 15 U.S.C. § 2; *see also* 15 U.S.C. § 15 (providing individual right of action). To state a claim for attempted monopolization, a plaintiff must plead that (1) the defendant had "specific intent to achieve monopoly power in a relevant market"; (2) the defendant engaged in "predatory or anticompetitive conduct directed to accomplishing this purpose"; and (3) there is "a dangerous probability that the attempt at monopolization will succeed." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011).

Possessing or attempting to possess monopoly power does not by itself violate Section 2. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1996)). Rather, the law is well-settled that defendant must have "engaged in predatory or anticompetitive conduct" to be subject to Section 2 liability. *Mercatus Grp.*, 641 F.3d at 854; *see also, e.g.*, *American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320 (7th Cir. 1991) ("The offense of monopolization is the acquisition of monopoly by improper methods or, more commonly . . . the abuse of monopoly."); *State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991) ("Section 2 forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power."). In ruling on defendants' first motion to dismiss, the court observed that Labor One's Section 2 claim appeared to be based only on Staff Management's termination of the contract with Labor One. *See* Memorandum Opinion at 5-6.. Because the antitrust laws generally do not prohibit a company from refusing to deal with a rival, the court reasoned, "Labor One's allegation that Staff Management has terminated the parties' agreement does not on its face constitute an attempt to monopolize." *Id.* at 5 (citing, *inter alia*, *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409-10 (2004)).

---

assume that Labor One is relying on the first definition listed here. In any event, this issue is immaterial; as the court explains below, it need not address whether Labor One has sufficiently alleged a relevant market because it dismisses the antitrust claim on other grounds.

In its effort to allege anticompetitive conduct, the amended complaint fares no better. Specifically, Labor One asserts that Staff Management engaged in anticompetitive conduct by (1) refusing to pay Labor One (and thereby attempting to force Labor One into insolvency); (2) making false statements to Aramark about the quality of Labor One's temporary employees, including by accusing them of inaccurately reporting hours worked; (3) repeatedly requesting background checks and drug tests for Labor One's temporary employees; and (4) "attempt[ing] to require Labor One to either hire temporary workers from Staff Management's parent company or transition [its] temporary workers to Staff Management's preferred vendor list." (Am. Compl. ¶¶ 44, 96-98; Labor One Opp. 3, 8.)[4]

Labor One admits that it was able to provide Aramark with temporary employees for McCormick Place—in other words, to participate in what it defines as the relevant market—only through its contract with Staff Management. (*See, e.g.*, Am. Compl. ¶¶ 22, 96; Labor One Opp. 7.) Accordingly, Labor One's allegations that Staff Management engaged in anticompetitive conduct are, in essence, allegations that Staff Management terminated the contract or sabotaged Labor One's ability to perform under it. Indeed, Labor One alleges that Staff Management terminated the contract only after trying to manipulate Labor One into doing the same. (*See* Am. Compl. ¶ 36 (alleging that according to Aramark, "Staff Management was dragging its feet with payments in an attempt to force Labor One to terminate the Agreement").) As noted, the antitrust laws generally do not require Staff Management to deal with Labor One, a competitor. *Verizon*

---

[4] Because Labor One does not allege that its business involves anything other than providing temporary employees, it is unclear what incentive Labor One would have to use Staff Management's temporary employees. Likewise, because Labor One alleges that Staff Management tried to prevent it from supplying temporary employees from the Community First Program (*see, e.g., id.* ¶¶ 36, 45-46), the court does not understand why Staff Management would permit or even desire that Labor One "transition" those employees to its "preferred vendor list." (*Id.* ¶ 98.) Accordingly, the court assumes that this last allegation is coextensive with the allegation that Staff Management tried to exclude Labor One from the relevant market by replacing Labor One's temporary employees with its own or those from preferred vendors. (*See id.* ¶ 36.)

7

*Commc'ns*, 540 U.S. at 409-10; Memorandum Opinion at 5. Nor do they require Staff Management to honor a subcontract with Labor One for services under its contract with Aramark. *See Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 856 (11th Cir. 1998) (where defendant terminated subcontract with plaintiff for services under a separate contract between defendant and a third party, defendant's conduct could not "be characterized as anticompetitive" and plaintiff's rights against defendant, if any, "sound[ed] in contract"). Accordingly, Labor One's allegations that Staff Management terminated or otherwise sabotaged the parties' contract— whether by delaying payments, souring Aramark on Labor One's temporary employees, or imposing disruptive screening requirements—do not plead anticompetitive conduct.

Labor One cites *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), for the proposition that in some circumstances, a court can impose antitrust liability for refusal to deal with a competitor. (Labor One Opp. 8-9.) Labor One argues that the court should do so here because like the defendant in *Aspen Skiing*, Staff Management displayed "a willingness to forsake short-term profits to achieve an anticompetitive end." (Labor One Opp. 9.) The court is not persuaded. In *Aspen Skiing*, defendant discontinued an agreement with its competitor to offer a ski pass that customers could use interchangeably at the parties' resorts. *See Aspen Skiing*, 472 U.S. at 589-91. The evidence showed, among other things, that if defendant continued to offer the interchangeable pass, it would still be compensated at retail price. *See id.* at 593 n.14, 610. The evidence also showed that offering the interchangeable pass "provided [defendant] with immediate benefits" and benefitted consumers. *Id.* at 610. This evidence, the court determined, supported an inference that in ceasing to offer the pass, defendant "was not motivated by efficiency concerns" and instead "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610-11.

The circumstances in the present case are not comparable. First, in *Aspen Skiing*, defendant's rival was an independent market participant. *See, e.g.*, 472 U.S. at 590-91. Here Labor One concedes that it was participating in the relevant market only through its contract with

Staff Management. Accordingly, Staff Management could harm Labor One's position in the market only by terminating the parties' contract or rendering Labor One unable to perform its contractual obligations. Labor One's remedy, if any, for such harm arises under contract law. Second, although Staff Management was entitled to three percent of Labor One's gross sales per invoice under the parties' contract (*see* Labor One Opp. 9; Am. Compl. ¶ 22), Labor One alleges that Staff Management would "receive 100% of the revenues for any temporary workers it provided to Aramark" directly rather than through Labor One. (Am. Compl. ¶ 13.) It is not clear, therefore, that Staff Management's alleged anticompetitive actions left it worse off in the short-term than it would have been by making good on the parties' contract. Third, other than alleging in a conclusory fashion that Staff Management's actions "result[ed] in increased labor costs," Labor One does not allege that Staff Management was "willing to sacrifice . . . consumer goodwill." (Am. Compl. ¶ 106; *Aspen Skiing*, 472 U.S. at 611.) For these reasons, Labor One has not convinced the court that this is one of the rare cases in which refusal to deal with a competitor can give rise to antitrust liability.

Labor One's Section 2 claim fails for an additional reason as well: Labor One has not "plausibly [pleaded] the existence of an antitrust injury," which it must do in order to state a Section 2 claim. *Tamburo*, 601 F.3d at 699; *see also, e.g.*, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (stating that a private antitrust plaintiff cannot recover damages unless it "prove[s] the existence of *antitrust* injury" (internal quotation marks omitted)). Antitrust lawsuits are to be brought to enforce rights of "those persons for whose benefit the laws were enacted"— that is, consumers. *Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 317 (7th Cir. 2012); *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996) ("[W]e stress that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business.") When conduct excludes a competitor from the marketplace, it raises antitrust concerns "only if it impairs the health of the competitive process itself." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). To

challenge its exclusion from the market as an antitrust violation, therefore, a plaintiff must prove that the likely "effect of the exclusion will be to raise prices above . . . the competitive level, or otherwise injure competition." *Id.*

The court dismissed Labor One's original complaint in part because "Labor One ma[de] no such allegation." Memorandum Opinion [42] at 6. In its amended complaint, Labor One alleges that Staff Management's anticompetitive conduct "result[ed] in increased labor costs." (Am. Compl. ¶ 106.) As noted above, this conclusory statement is unsupported; there are no factual allegations concerning the actual cost of temporary laborers at McCormick Place at any given time. Moreover, both the amended complaint and Labor One's briefing suggest that companies other than Labor One and Staff Management supply temporary employees in the relevant market. (*See id.* ¶ 98 (alleging that Staff Management has a "preferred vendor list"); Labor One Opp. 9 (suggesting that there are "similarly situated companies" in the market "that are not part of [Staff Management's] preferred vendor list").)[5] Accepting this allegation as true, it undermines Labor One's allegation that labor costs increased merely because Staff Management excluded it from the market. Labor One's allegation that Staff Management's conduct "increased labor costs" is a "formulaic recitation" of an antitrust injury and therefore does not sufficiently plead that element of Labor One's Section 2 claim. *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Labor One's allegations that Staff Management's actions "impair[ed] the competitive process," "injured competition," and "caused an antitrust injury" are also legal conclusions couched as facts, and the court declines to credit them. (Am. Compl. ¶¶ 97, 102-03; *see Twombly*, 550 U.S. at 555.) And Labor One's remaining allegations fail to plead an antitrust injury because they concern injuries only to Labor One itself as a competitor. (*See* Am. Compl. ¶¶ 100,

---

[5] Labor One argues that Staff Management excluded these "similarly situated" companies (*see* Labor One Opp. 9), but no such allegation appears in the amended complaint.

105 (alleging that Staff Management's conduct "undermined [its] ability to provide temporary labor services to Aramark as contemplated" and interfered with "current and future contractual relationships" that would have enabled Labor One to "provid[e] temporary workers in the service industry"); *Ehredt*, 90 F.3d at 240 (antitrust law is meant "to protect consumers from producers, not to protect producers from each other").)

Labor One argues that it has sufficiently pleaded antitrust injury because its exclusion from the market is "inseparable" from harm to the competitive process. (Labor One Opp. 3-4.) In making this argument, Labor One relies on *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 466 F.3d 961, 967 (11th Cir. 2006). Labor One's reliance on *Nucor* is misplaced. In that case the court credited at the summary judgment stage plaintiff's evidence that it was capable of entering the market and that if it had been allowed to do so, it would have become "a viable competitor" of the dominant market participant. *Id.* at 967. In addition, the court credited evidence that "[plaintiff's] becoming a viable competitor" would likely have generated pressure to reduce prices. *Id.* at 968. The court concluded that "the injury to [plaintiff]—its exclusion from the relevant market—is inseparable from the alleged harm to competition" because the exclusion "denies consumers the benefit of the pressure to lower prices . . . ." *Id.* at 967-69. Here, as already noted, Labor One has not provided factual allegations to support the conclusion that its presence in the market exerted any pressure on Staff Management to lower the cost of temporary employees. Labor One's exclusion from the market, therefore, is not "inseparable" from harm to the competitive process. *Nucor*, 466 F.3d at 967.

Finally, Labor One maintains that its allegations concerning antitrust injury are similar to those in *OverEnd Technologies, LLC v. Invista S.A.R.L.*, 431 F. Supp. 2d 925 (E.D. Wis. 2006). Labor One, however, ignores major differences between the allegations in *OverEnd* and those in this case. In *OverEnd*, plaintiff alleged that "defendants control[led] roughly three quarters of the market . . . and [were] using a fraudulently-obtained patent to force competitors out of business and to inhibit others from entering the field." *Id.* at 930. The court noted that "[s]uch behavior

11

could lead to reduced competition, decreased innovation, and higher prices to consumers," and determined that plaintiff had plausibly alleged an antitrust injury. *Id.* By contrast, Labor One alleges that Staff Management drove only it—not multiple competitors—out of the market. (Again, Labor One's suggestion in its opposition that other staffing companies are also victims finds no support in the amended complaint.) Moreover, Labor One does not allege that Staff Management tried to block other competitors from *entering* the market. Because the record lacks allegations that were crucial to the court's decision in *OverEnd*, that case does not assist Labor One. The court also notes that *OverEnd* was decided before *Twombly* and *Iqbal*. *Cf. OverEnd*, 431 F. Supp. 2d at 928 (stating that "[d]ismissal of an action . . . is warranted if the plaintiff can prove no set of facts in support of his claims that would entitle him to relief" (citing, *inter alia*, *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).)

For the foregoing reasons, the court dismisses Labor One's Sherman Act claim.[6]

**B.      Section 1981**

Labor One's alternative claim to federal jurisdiction over this contract dispute rests on the Civil Rights Act. Thus, Labor One claims that Staff Management violated 42 U.S.C. § 1981 by willfully "impeding [Labor One's] right to make and to enforce contracts based on racial discrimination . . . ." (Am Compl. ¶ 122.) In support of this claim, Labor One alleges that after it "informed Staff Management[] . . . that its temporary workers were almost entirely African-American, Staff Management asked that Labor One not continue to use those workers, referring to them as 'those people' . . . ." (*Id.* ¶ 121.) Relatedly, Labor One alleges that Staff Management asked it to replace the workers with workers "from Staff Management's hiring system." (*Id.*) Labor One further alleges that "Staff Management's acts or omissions were motivated, at least in part,

---

[6] Because the court is dismissing this claim for failure to sufficiently plead anticompetitive conduct and an antitrust injury, the court need not address Staff Management's arguments that Labor One has failed to allege (1) a relevant market; (2) that Staff Management's actions had a substantial effect on interstate commerce; and (3) that Staff Management had monopoly power. (*See* Defs.' Mot. to Dismiss [62], 5-8.)

by the fact that Labor One has a workforce of minority-based temporary workers of African-American descent under the Community First Program." (*Id.* ¶ 123.)

Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474-45 (2006) (quoting 42 U.S.C. § 1981(a)). The statute defines the making and enforcing of contracts as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). It applies to public and private contracts, *see, e.g.*, *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987), as well as to existing and "would-be" contracts. *Domino's Pizza*, 546 U.S. at 476. To state a claim under § 1981, a plaintiff must allege that (1) it is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute, such as the making and enforcing of a contract. *Black Agents & Brokers Agency, Inc. v. Near N. Ins. Brokerage, Inc.*, 409 F.3d 833, 837 (7th Cir. 2005). Moreover, "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Domino's Pizza*, 546 U.S. at 479-80.

In some circumstances, a corporation has standing to assert a § 1981 claim, such as when the corporation has "assume[d] an 'imputed racial identity' from its shareholders" and can therefore be a direct target of discrimination. *Amber Pyramid, Inc. v. Buffington Harbor Riverboats, LLC*, 129 F. App'x 292, 294-95 (7th Cir. 2005) (unpublished) (quoting *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1059 (9th Cir. 2004)); *see also, e.g.*, *Jones v. Culver Franchising Sys., Inc.*, 12 F. Supp. 3d 1079, 1084-85 (N.D. Ill. 2013) (determining that corporations had standing to pursue a claim under § 1981); *A.H. Empl. Co. v. Fifth Third Bank*, No. 11 C 4586, 2012 WL 686704, at *5 (N.D. Ill. Mar. 1, 2012) (similar). Neither party has addressed whether Labor One has standing to assert its § 1981 claim, and Labor One has not pleaded facts that would allow the court to make this determination. The court will assume for

the sake of argument that Labor One has standing because, even if the claim is properly before the court, it must be dismissed. As in the original complaint, the allegations in the amended complaint do not "raise [Labor One's] right to relief above the speculative level." *Twombly*, 550 U.S. at 555. First, Labor One still fails to explain how any of Staff Management's actions impeded Labor One's own right to enter into employment agreements with its workers. Second, as the court addresses in more detail below, Labor One's allegations offer no plausible basis for a conclusion that Staff Management acted with an intent to discriminate based on race.

Labor One argues that Staff Management acted with discriminatory intent because "it stated in its termination letter that it was going to transition Labor One workers into Staff Management's workforce, which never occurred because it did not want African American workers under the Community First Program." (Labor One Opp. 12 (citing Am. Compl. ¶¶ 36, 38, 99).) But Labor One's argument that Staff Management "did not want African American workers" is unsupported by factual allegations. Indeed, in paragraphs 36 and 38 of the amended complaint, Labor One merely alleges that Staff Management wanted to replace Labor One's temporary employees with its own. In paragraph 99, Labor One alleges that Staff Management's only stated reason for terminating the contract was Labor One's "failure to enter time correctly in the VMS system." (Am. Compl. ¶ 99.) On its face, that reason is unrelated to race. Even viewed in the light most favorable to Labor One, the allegations in paragraphs 36, 38, and 99 of the amended complaint permit only a conclusion that Staff Management terminated the contract or otherwise sought to replace Labor One's temporary employees as a result of the parties' billing dispute.

Other arguments in Labor One's opposition suffer from the same flaws. Labor One, for example, argues that Staff Management acted with discriminatory intent when it questioned "the honesty and integrity of Labor One's temporary workers," including by accusing them of "stealing time and hours." (Labor One Opp. 13.) But Labor One admits that Staff Management began questioning the workers' honesty and integrity only "after Labor One complained to Aramark of not being paid for six months." (*Id.*; *see also* Am. Compl. ¶¶ 32, 39-42 (similar).) In addition,

Labor One now suggests that Staff Management required its temporary employees to undergo extra background checks and drug tests because it knew that most of the workers were African-American. (Labor One Opp. 13.) In the amended complaint, however, Labor One alleges that Staff Management began requesting the extra background checks and drug tests "[a]s a result of Labor One's efforts to get paid for its services." (Am. Compl. ¶¶ 44.) Finally, Labor One maintains that because Staff Management knew that most of its temporary employees were African-American, its request for Labor One to stop using "those people" exhibited discriminatory motive. (Labor One Opp. 13.) Without more, however, the allegation that Staff Management used that phrase does not "nudge[] [Labor One's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. In short, Labor One has not offered any basis for the conclusion that Staff Management's conduct, including its decision to terminate the contract, was racially motivated; to the contrary, Labor One's allegations instead support the inference that Staff Management's goal was to avoid paying Labor One amounts to which Labor One is entitled.

Labor One separately argues that it has satisfied the pleading standard for its § 1981 claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under the *McDonnell Douglas* framework, Labor One must plead a *prima facie* case of discrimination before the burden shifts to Staff Management to articulate a legitimate, non-discriminatory reason for its allegedly discriminatory actions. *See id.* at 802. To sufficiently plead its *prima facie* case, Labor One must allege, among other things, that Staff Management treated Labor One less favorably than a similarly situated business outside the protected class. *See Amber Pyramid*, 129 F. App'x at 295 (establishing a *prima facie* case for racial discrimination in making and enforcing contracts requires showing that the plaintiff "(1) is a member of a protected class, (2) satisfactorily performed the contract, (3) suffered an adverse action, and (4) was treated differently than another similarly situated contractor outside the protected class") According to Labor One, it has alleged that "it was treated differently." (Labor One Opp. 13 (citing Am. Compl. ¶¶ 14, 30-33, 43, 45, 47).) But the amended complaint (including the paragraphs

that Labor One cites) contains no such allegations.  Because Labor One has not pleaded this element, it has not satisfied its burden under the *McDonnell Douglas* framework.

For the foregoing reasons, the court dismisses Labor One's § 1981 claim.  Having also dismissed Labor One's claim under the Sherman Act, there is no other basis for federal jurisdiction.  Moreover, Labor One has not attempted to establish that the court has diversity jurisdiction.  The court, therefore, dismisses the amended complaint in its entirety without prejudice.  *See RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) ("[W]hen all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." (quoting *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010))).

## **CONCLUSION**

For the foregoing reasons, the court grants Defendants' motion to dismiss Labor One's amended complaint [62].  The Clerk is directed to terminate the case in this court, without prejudice to litigation of Labor One's breach of contract claim in any court having jurisdiction over that claim.

ENTER:

Dated:  August 5, 2019

_____
REBECCA R. PALLMEYER
United States District Judge